**UNITED STATES of America,
Appellant,**

v.

**Mary Frances CARRIER, Appellee.**

**No. 534, Docket 81–1310.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 15, 1981.

Decided March 1, 1982.

Certiorari Denied June 21, 1982.
See 102 S.Ct. 2972.

George Lowe, U. S. Atty., N. D. N. Y., Syracuse, N. Y. (John J. McCann, Joseph Pavone, Asst. U. S. Attys., Syracuse, N. Y., Ronald N. Ohata, Atty., Dept. of Justice, Washington, D. C., of counsel), for appellant.

Ronald R. Benjamin, Binghamton, N. Y., for appellee.

Before TIMBERS, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

An indictment was dismissed which without embellishment simply tracked the language of 18 U.S.C. § 871(a) that makes it a crime "knowingly and willfully" to make "any threat to take the life of or to inflict bodily harm upon the President of the United States."[1] The district court found this indictment insufficient on its face because it failed to allege the factual context in which the actions of the defendant occurred. In dismissing it as a matter of law, the lower court concluded that the alleged threatening words could not under any circumstances constitute "threats" within the proscription of the statute. We reverse and remand this case for the reasons which follow.

## FACTS.

The facts in this case may be briefly stated. Kevin Mitchell, a Special Agent with the United States Secret Service, submitted an affidavit to the District Court for the Northern District of New York to obtain a warrant to search a 1974 Ford Pinto with a Vermont license plate and to seize deadly weapons and various books, papers and letters containing threats to the life of the President. The basis for Mitchell's application was information he received on April 6, 1981 from the Binghamton, New York, Police Department concerning the arrest five days earlier of Mary F. Carrier. Appellee, age 43, and with no fixed address, was arrested by the Binghamton police for

---

1. That statute provides that:

    (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States . . . . . . . . . . . . or knowingly and willfully otherwise makes any such threat against the President . . . . . . . . . shall be fined not more than $1,000 or imprisoned not more than five years, or both.

    18 U.S.C. § 871(a) (1976).

an unlawful attempt to retrieve her Ford Pinto from Star Auto Parts. The Vermont license plate on the vehicle revealed that it was registered to Mary Carrier, Hotel Coolidge, White River Junction, Vermont. Following her arrest Carrier was placed in custody in the Broome County [New York] Jail and was discovered to have in her possession an envelope which contained a threat to the life of the President of the United States.

The following day, April 7, Agent Mitchell went to Binghamton and examined the envelope, then in the possession of the local police, and found the following inscriptions: "impeach the President," "murder the President" and "kill". He interviewed Carrier in the Broome County Jail and she stated to him "yeah, I know why you're here. I threatened the President. The President should be murdered." In addition Mitchell observed written various inscriptions on the wall of Carrier's jail cell, including "shoot the Governor of the State of New York."

The agent arrested Carrier on April 8 for a violation of 18 U.S.C. § 871(a). The following day Carrier stated in substance to Agent Mitchell, "I am a big game hunter and have owned numerous rifles, shotguns and a 32." She also remarked "the only thing I'll do is blow the head off the President of the United States."

As a result of Mitchell's affidavit a warrant was signed by the district court which authorized a search of the Ford Pinto. The inventory of the property seized revealed only notebooks and miscellaneous papers; no firearms were discovered. There was, however, a written slip in the car listing the cost of a .44 magnum and a .32 special.

At a hearing before the district court the United States Attorney advised it that Carrier had a lengthy "rap" sheet including convictions for assault and other crimes committed in New York and New Hampshire. On April 17 the government moved and was granted an order directing a psychiatric examination of the defendant pursuant to 18 U.S.C. § 4244.[2] As a result of that examination appellee was found competent to stand trial.

A two-count indictment returned in the United States District Court for the Northern District of New York charged defendant, Mary Frances Carrier, with threatening to take the life of or inflict bodily harm on the President of the United States. At arraignment on July 1, 1981 defendant orally moved to dismiss the indictment on the ground that it was insufficient on its face. This motion was granted on July 7, 1981. The district court ruled that the indictment was insufficient because it failed to state the factual context in which the actions of the defendant occurred. The Court also ruled that, as a matter of law, the words used would not, under any circumstances, constitute threats within the proscription of the statute. The United States appeals the dismissal of Count II[3] of the two-count indictment. It does not appeal the dismissal of Count I.

---

**2.** 18 U.S.C. § 4244 (1976) provides in pertinent part that:

Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending.

**3.** Count II of the indictment reads, in relevant part, as follows:

COUNT II

On or about the 9th day of April, 1981, in the Northern District of New York,

MARY FRANCES CARRIER,

in the presence of Kevin M. Mitchell and John LaVergne, [a Broome County, New York, Deputy Sheriff] willfully and knowingly did make an oral threat to take the life of, and to inflict bodily harm upon, the President of the United States, in the verbal use of threatening language, substantially as follows: "It's too bad that Hinckley wasn't successful in killing that son of a bitch . . . the only thing I will do is blow the head off of the President of the United States."

## DISCUSSION

### I. *Validity of the Indictment*

■ The indictment is valid on its face. Rule 7(c)(1)[4] of the Federal Rules of Criminal Procedure neither requires nor permits that a different rule—one engrafted by judicial construction—should apply where "free speech" considerations may constitute a defense to the crime charged.

■ Under Rule 7(c)(1) an indictment "shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged.... It need not contain ... any other matter not necessary to such statement." Fed.R.Crim.P. 7(c)(1). This rule is designed to eliminate prolix indictments and "to secure simplicity in procedure." *United States v. Debrow*, 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953). The facts alleged must be adequate to permit a defendant to plead former jeopardy upon prosecution. The indictment must also be sufficiently specific to enable the defendant to prepare a defense. 8 Moore's Federal Practice ¶ 7.04 (2d ed. 1981).

On its face, this indictment does contain a plain and concise statement of the essential facts constituting the offense charged. The language of the indictment charges that the defendant, Mary Frances Carrier, on April 9, 1981, in the presence of two named people did "willfully and knowingly" make a threat to take the life of or to inflict bodily harm upon the President of the United States by stating, "It's too bad that Hinckley wasn't successful in killing that son of a bitch ... the only thing I will do is blow the head off of the President of the United States." The court below, however, concluded that because of the imperatives of the First Amendment—"Congress shall

make no law ... abridging freedom of speech"—the indictment was deficient since it failed to include a description of the factual context within which the defendant uttered these words. It also concluded that such failure denied the accused her Sixth Amendment right "to be informed of the nature and cause of the accusation."

We cannot agree. At the outset we observe that the operative key words of section 871(a)—"threat" and "willfully and knowingly"—are terms of art used in statutes too numerous to recite. Inasmuch as these terms do not change from statute to statute or indictment to indictment, they are definite enough in legal meaning to give defendant notice of the charge against her. *Hamling v. United States*, 418 U.S. 87, 118, 94 S.Ct. 2887, 2908, 41 L.Ed.2d 590 (1974); *United States v. Trotta*, 525 F.2d 1096, 1099, n.6 (2d Cir. 1975).

■ Further, neither the historical derivation of this statute, nor its purpose, as expressed by its sponsors in Congress, would dictate that an exception be made for indictments which raise a possible First Amendment issue. Rather than carve out such an exception to the established simplified construction, the preferable procedure would be for the defendant to seek a bill of particulars. *Debrow*, 346 U.S. at 378, 74 S.Ct. at 115. A bill of particulars may not save an invalid indictment; it may provide the defendant with the evidentiary details needed to establish his defense.[5]

■ The court below speculated that, so far as one could gather from the language of the indictment, the threat in this case could have been protected speech spoken at a cocktail party. It is our view, however, that where the indictment is legally sufficient, as it is here, the district court may

---

**4.** Rule 7(c)(1) of the Federal Rules of Criminal Procedure states, "(1) In General. The indictment.... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."

**5.** Armed with a bill of particulars, which may be obtained right after arraignment as per Fed. R.Crim.P. 7(f), setting forth the details under which defendant's allegedly threatening words

against the life of the President were spoken, defendant could have made a motion to dismiss the indictment prior to trial. Fed.R.Crim.P. 12(b). The motion should then be determined "before trial, unless the court, for good cause orders that it be deferred for determination at trial of the general issue...." Fed.R.Crim.P. 12(e). *See generally* 1 Wright, Fed.Prac. and Proc. §§ 191, 194, at 178 (Supp.1980).

not dismiss it simply because it deems the dismissal to be in the interests of justice. *See United States v. Artuso*, 618 F.2d 192, 196 (2d Cir. 1980).

## II. *Dismissal as a Matter of Law Was Not Warranted*

■ Whether the words spoken by defendant constitute threats within the proscription of 18 U.S.C. § 871(a) may not be decided as a matter of law in this case. Even assuming the sufficiency of the indictment, the district court concluded that it must be dismissed as a matter of law because the threatening words could not, under any circumstances, constitute the kind of threat made criminal under section 871(a). The history and purpose of the statute, along with the precedents which have interpreted it, bring us to a different conclusion. In our view the defendant's intention when uttering these words and the circumstances surrounding their use, present issues of fact to be tried by a jury.[6]

A brief look at the statute's historic derivation is helpful in shedding some light on its proper interpretation. A Statute of Treasons was enacted in the year 1352 (circa) during the reign of Edward III. Treason under the statute consisted of compassing or imagining the death of a King, his consort, or his oldest son. 25 Edw. III, sess. 5, c.2. The statute was interpreted to declare treasonous any intention, however manifested, which pointed at the death of the King, including mere words which showed such intent. 3 W. Holdsworth, *A History of English Law*, 292–93 (5th ed.

1931). For over 500 years the crime of treason rested primarily, if not solely, on this old English statute.[7] It is from this ancestry that section 871, as enacted in the federal legislation of February 14, 1917, was born. The interpretation we accord this law should be similar to that accorded its ancient predecessor. Thus it is the use of words constituting a "threat" which constitutes the crime. The words must impart an intent to harm the President. If oral, they must have been uttered in the hearing of someone; yet the threat need not have been communicated or intended to be communicated to the President. *See*, Note, *Threats to Take the Life of the President*, 32 Harv.L.Rev. 724 (1919).

The legislative purpose in enacting section 871 may be gleaned from the discussion which accompanied its enactment in 1917. Dialogue in the House made clear the concern of Congress over the assassination of three presidents and its belief that the Chief Executive "ought to be protected in every way possible." 53 Cong.Rec. 9378 (1916). Stating that "an ounce of prevention is worth a pound of cure," Congressman Webb commented that "we want to prevent the threats which often incite men to kill and murder." *Id.* At the same time the sponsors of the bill wanted the word "willfully" to remain because that word ordinarily conveys the idea of wrongfulness as well as intent. *Id.* at 9379. The concept of willfullness was preserved "so as not to make innocent acts punishable." *Id.*[8]

In dismissing the indictment as a matter of law, the court below relied on *Russell v.*

---

6. It would have been helpful in this type of case had the government included in the indictment a more detailed statement of the factual context surrounding the utterance of the threat. It might, at least, have resulted in a denial of the motion to dismiss and thus obviated this appeal. 28 U.S.C. § 1291 (1976). As to the finality and appealability of an order denying a challenge to the sufficiency of an indictment, *see, Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

7. One noteworthy addition was the Act of 1695, 7 & 8 Will. III, c.3, § 2, followed in this case, which required two witnesses to the overt act or acts alleged in the indictment. T. Plunknett,

*A Concise History of the Common Law* 393–94 (2d ed. 1936).

8. The House Report that accompanied the bill from the House Judiciary Committee stated: "This bill is designed to restrain and punish those who would threaten to take the life of, or inflict bodily harm upon, the President of this Republic. *It is the first and highest duty of a Government to protect its governmental agencies, in the performance of their public services, from threats of violence which would tend to coerce them or restrain them in the performance of their duties.*" H.R.Rep.No.652, 64th Cong., 1st Sess. (1916) (emphasis supplied).

*United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). That case involved a prosecution under 2 U.S.C. § 192 which makes it a misdemeanor for any person subpoenaed to testify before a Congressional Committee to refuse to answer "any question pertinent to the question under inquiry." The indictment in *Russell* merely stated that the defendants refused to answer questions, the answers to which were pertinent to the question under inquiry. The indictment included no statement of the subject which was under inquiry. Thus the Supreme Court held that the defendants were not adequately apprised of the accusations against them. As a corollary, the failure to include in the indictment the subject under inquiry denied the Court the opportunity to decide whether the facts alleged were sufficient in law to support a conviction. Since in *Russell* the crime charged was failing to give answers to pertinent questions, the pertinency of the questions was inextricably interwoven with the crime. To leave out of the indictment the pertinency of the questions was to leave out an essential element of the crime or "the very core of criminality." *United States v. McClean*, 528 F.2d 1250 (2d Cir. 1976).

In the instant case the critical element is the mental state of "knowingly and willfully" uttering a threat.[9] Here no essential element of the crime was left out of the indictment under which the defendant was charged.

In *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) the Supreme Court held that we must interpret the statute with the commands of the First Amendment in mind, so that what is a threat "must be distinguished from what is constitutionally protected speech." *Watts*, 394 U.S. at 707, 89 S.Ct. at 1401. Watts, an 18 year-old black youth, was participating in a public rally against the Viet Nam War at the Washington Monument in August 1966. He had just received his 1–A draft classification and was ordered to report for

a physical. He stated, "I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." Following his conviction under section 871(a) and its affirmance in the United States Court of Appeals for the District of Columbia Circuit, the Supreme Court held that considering its context and the reaction of the listeners, who laughed, the statement did not constitute a "true 'threat'," but was mere "political hyperbole." *Watts*, 394 U.S. at 708, 89 S.Ct. at 1401. Reference to the commands of the First Amendment occurs again in the phrase " 'that debate on public issues should be uninhibited, robust, and wide open.' " *Watts* at 708, 89 S.Ct. at 1401, quoting from *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

■ Uninhibited, robust, "free trade in ideas," as Justice Holmes felicitously expressed it, *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting), is essential in a democracy. But democracy itself is a fragile institution. To safeguard both freedom of speech and democracy is the responsibility in the first instance of Congress. Threats against the life of this country's highest elected official imperil the nation's very survival. Four Presidents have been assassinated; attempts to shoot four recent presidents have resulted in the death of one president. Were threats to go unpunished, our highest officials might soon only be able to communicate with the populace via the communications media while ensconced in a fortress. As Justice Frankfurter observed, the First Amendment was not intended to give immunity for every possible use of language. Certain kinds of utterances such as "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace" are not protected. *Dennis v. United States*, 341 U.S. 494, 544,

---

**9.** We noted in *United States v. McClean*, 528 F.2d 1250, 1257 (2d Cir. 1976) that prosecution under 2 U.S.C. § 192 had been infected with unfairness and uncertainty because the courts had found it nearly impossible to ascertain what the subject under inquiry was. *See also, United States v. Seeger*, 303 F.2d 478 (2d Cir. 1962).

71 S.Ct. 857, 885, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring). Although since *Dennis* the Supreme Court has given some protection to profanity, *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), and substantial protection to libels, *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), it remains no less true that some uses of speech are not protected. The question here is whether the language brings about certain evils which Congress has a right to prevent. The fact that an issue of free speech arises creates no exception to the principle that courts are not legislators. *Dennis,* 341 U.S. at 539–40, 71 S.Ct. at 882–83.

■ With these concerns in mind, we believe that whether words used are a true threat is generally best left to the triers of fact. Surrounding factual circumstances may not easily be required to be recounted in all indictments. The initial burden is on the government to prove a "true" threat. Only where the factual proof is insufficient as a matter of law should the indictment be dismissed. In *Watts* the Supreme Court held that defendant's words "when taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners" should not have gone to the jury. Most cases are within a broad expanse of varying fact patterns which may not be resolved as a matter of law, but should be left to a jury. Some of the factors a jury must weigh in considering the context in which the words were spoken include the kind of statement made, i.e., merely political hyperbole or specifically directed at the President; the place where it was made; to whom it was made; how it was spoken, i.e., plainly and unconditionally or in jest. *See United States v. Kelner,* 534 F.2d 1020 (2d Cir. 1976).

Where similar statutes employ the word "threat," it is generally held that the better course is to decide each case on its facts leaving defendant's intent as a question for the jury. *United States v. Lincoln,* 589 F.2d 379, 381–82 (8th Cir. 1979) (prosecution under 18 U.S.C. § 876—threatening letter); *United States v. Kelner,* 534 F.2d 1020, 1024–25 (2d Cir. 1976) (prosecution under 18 U.S.C. § 875(c)—threatening communication in interstate commerce to injure the person of another); *cf. United States v. Barcley,* 452 F.2d 930 (8th Cir. 1971) (prosecution under 18 U.S.C. § 876—proof beyond reasonable doubt of real threat by prisoner to his lawyer not established).

As the decisions in our own and sister circuits make clear, there is no warrant to dismiss this indictment as a matter of law in a section 871(a) prosecution. In *United States v. Compton,* 428 F.2d 18 (2d Cir. 1970), the defendant was arrested immediately after making a telephone call to the New York City Police Department during which he threatened to assassinate President Nixon. In sustaining his conviction we held that it is not necessary to establish defendant's intent to carry out his threat. Other convictions for the use of threatening language have recently been upheld. *United States v. Frederickson,* 601 F.2d 1358 (8th Cir. 1979) (the conviction was affirmed on Count I, "I will have to kill him" and Count III, "[B]low them all up.... start with the President and go down."); *United States v. Lincoln,* 462 F.2d 1368 (6th Cir. 1972) (conviction affirmed on threat to go to Washington and wait for the best opportunity to kill the President).[10]

The order granting the motion to dismiss the indictment is reversed and the case is remanded to the district court for trial or

---

**10.** Oft-cited old cases finding violations of 18 U.S.C. § 871 include *United States v. Apel,* 44 F.Supp. 592, 593 (N.D.Ill.1942) (displaying posters urging the hanging of President Roosevelt); *United States v. Stickrath,* 242 F. 151, 152 (S.D. Ohio 1917) (declaration that "President Wilson ought to be killed. It is a wonder someone has not done it already. If I had an opportunity, I would do it myself."); *Clark v. United States,* 250 F. 449 (5th Cir. 1918) (declaration that "Wilson is a wooden-headed son of a bitch. I wish Wilson was in hell, and if I had the power I would put him there"). *See also,* Note, *Threats to Take the Life of the President,* 32 Harv.L.Rev. 724 (1919).

other proceedings consistent with this opinion.