STATE of North Dakota, Plaintiff and Appellee,

v.

Melford H. HAUGEN, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Jarl HEGVICK, Defendant and Appellant.

STATE of North Dakota, Plaintiff and Appellee,

v.

Bernice HEGVICK, Defendant and Appellant.

Cr. Nos. 1157 to 1159.

Supreme Court of North Dakota.

Aug. 20, 1986.

James W. Wold, State's Atty., Cooperstown, for plaintiff and appellee.

Glenn Pomeroy & Ralph B. Maxwell, Fargo, for defendants and appellants; argued by Ralph B. Maxwell.

LEVINE, Justice.

Melford Haugen, Jarl Hegvick, and Bernice Hegvick appeal from criminal judgments entered upon jury verdicts finding them guilty of the offense of threatening public servants. We reverse.

The defendants were Griggs County farmers who lost their farmland. In an effort to recover the land, the defendants, acting pro se, commenced lawsuits against everyone they thought might be connected with the subject matter of their grievances.

Haugen brought suit against the present owners of the farmland. Griggs County State's Attorney James Wold represented the present landowners in the action. In February 1985, Haugen requested Griggs County Sheriff Vernon Fuglestad to serve eviction notices upon the present owners. Against the advice of Wold, Fuglestad served the eviction notices.

On February 20, 1985, the Board of Commissioners of Griggs County adopted a resolution recommending that Wold file a complaint with the Governor seeking the removal of Fuglestad from office. During early March 1985, the county commissioners received by certified mail letters allegedly signed by the defendants. The letters were identical in content and stated as follows:

"Re: CONSTRUCTIVE NOTICE AND DEMAND:

"You are given Notice to the effect that you are interfering in a Law case on crime in your county. This is an out and out effert (sic) to try to get rid of an honest Sheriff who is trying to follow the Laws of our country and allow the people and our children, and Grandchildren to live in a free country as we have. There has been a complete effort in North Dakota to get rid of our Constitution, and the Laws that it stands for. This Constitution has given us the right of speach (sic) and press.

"States Attorney James Wold has either convenced (sic) you that he has the authority to decide what is Law and what is not or you have joined in the conspiracy to cover up organized crime in your county. This notice is to let you know that you have ten (10) days from this Notice to let us know that you will not or are not in anyway (sic) going to stand back and help James Wold commit this crime against our Sheriff. You are county Commissioners, your duty is to keep up on whats (sic) going on in your county, to find the truth about whats (sic) going on. The Sheriff has done his own investigation, which is his job. He has not taken our word for it. He has known about some of the crimes for about two years, he has not jumped into this on our word. He is doing his duty. Now you do yours.

"If you fail to implement good faith restitution within ten (10) days from this Notice it will result in Civil and Criminal process to commence against you for DAMAGES. Re: Title 42 U.S.C. 1983, 1985, 1986. Title 28 U.S.C. 1331, 1343. Title 18 U.S.C. 241, 242, 2381, 2382, 2384, 892, 893 and 894 and other sections that will obviously appy (sic) as the Action is started against you.

\*       \*       \*       \*       \*       \*

"P.S. Be advised that this Notice will constitute 'prima facie' evidence in a court of competent jurisdiction and will be used *against you.*" [Emphasis in original.] [1]

The letters allegedly signed by the Hegvicks were accompanied by a copy of the commissioners' resolution, a document entitled "Answer to your resolution," and photocopies of various state statutory provisions relating to restrictions on the pow-

ers of state's attorneys and the duties and obligations of sheriffs.

During mid-March 1985, the county commissioners received similar materials. These materials included summonses and were purported to constitute actions against the commissioners. These actions were removed from county court to the Federal District Court, which ultimately dismissed the actions, noting that "[t]he case appears to be another of Plaintiffs' frivolous abuse of process actions which have come before this court."

Based upon the "Constructive Notice and Demand" letters received by the commissioners, the defendants were charged with threatening public servants under § 12.1–12–06(2)(b), N.D.C.C. The criminal informations alleged that the letters contained "a threat to commence criminal process against said officials unless 'good faith restitution' is 'implemented ... within 10 days,' said threat being related to an official action taken by the Board of Commissioners of Griggs County." The cases were consolidated for trial, during which the defendants did not testify. The jury convicted Haugen on three counts and the Hegvicks on four counts each. The defendants were sentenced to three years imprisonment with one year suspended. Their appeals were consolidated by stipulation of counsel.

Before reaching the dispositive issue in this case, we address the defendants' contention that their convictions should be reversed because the state failed to authenticate the handwriting on the alleged threatening letters.

Authentication is the process of establishing the relevancy of a document by connecting it with a person, place, or thing. *Farmers Union Oil Co. of Dickinson v. Wood,* 301 N.W.2d 129, 136 (N.D.1980). In

---

1. The federal statutes referred to in the letters are titled as follows: [Civil] 42 U.S.C. § 1983 (Civil action for deprivation of rights), § 1985 (Conspiracy to interfere with civil rights), § 1986 (Action for neglect to prevent); [Civil] 28 U.S.C. § 1331 (Federal question), § 1343 (Civil rights and elective franchise); [Criminal] 18 U.S.C. § 241 (Conspiracy against rights of

citizens), § 242 (Deprivation of rights under color of law), § 2381 (Treason), § 2382 (Misprision of treason), § 2384 (Seditious conspiracy), § 892 (Making extortionate extensions of credit), § 893 (Financing extortionate extensions of credit), and § 894 (Collection of extensions of credit by extortionate means).

*R & D Amusement Corporation v. Christianson*, 392 N.W.2d 385, 386 (N.D.1986), we stated:

"NDREv 901(a) treats questions of authentication as matters of conditional relevance to be determined according to NDREv 104(b). Explanatory Note to NDREv 901, N.D. Court Rules 1986 Desk Copy. The relevancy of a document is conditioned upon its authenticity. Thus, when a document is offered, a judge must make a preliminary determination whether sufficient proof has been introduced to allow a reasonable fact finder to conclude the document is authentic; *i.e.*, it is what its proponent claims it to be. If so, the judge must admit the evidence and the question of its weight and prosecutive force is one for the jury. NDREv 104(b); *State v. Vetsch*, 368 N.W.2d 547 (N.D.1985); *see generally* 11 Moore's Fed.Prac. § 901.03; 5 Weinstein's Evidence ¶ 901(a) [01].

"The question whether evidence should be excluded for lack of authentication is primarily within the sound discretion of the trial court. *See State v. Schneider*, 389 N.W.2d 604 (N.D.1986)."

■ It is uniformly recognized that a document may be authenticated by circumstantial evidence, such as the events preceding, surrounding, and following the transmission of a writing. *E.g., Zenith Radio Corp. v. Matsushita Elec. Ind. Co.*, 505 F.Supp. 1190, 1222–1226 (E.D.Pa.1980); *Commonwealth v. Brooks*, 352 Pa.Super. 394, 508 A.2d 316, 318–321 (1986); 5 Weinstein's Evidence ¶ 901(b)(4)[04] (1983). Depending upon the facts, such evidence may include information in the contents of the writing that is known by the purported sender and the recipient. *See United States v. Sutton*, 426 F.2d 1202, 1207 (D.C. Cir.1969); *Brooks, supra.* Once authenticity has been established for one document, it may serve as the basis for authentication of a disputed document through comparison by the trier of fact. *See* Rule 901(b)(3), N.D.R.Ev.; *Zenith Radio Corp., supra*, 505 F.Supp. at 1223; 5 Weinstein's Evidence ¶ 901(b)(3)[03] (1983); Annot., 41 A.L. R.2d 575 (1955).

In the present case, Lillie Simenson, the Griggs County Register of Deeds, testified that the defendants visited the clerk of court's office during June 1984 seeking to file a number of common law liens. After conferring with the state's attorney by telephone, Simenson refused to file the documents. During April 1985, Simenson received letters purportedly signed by Melford Haugen and Jarl Hegvick requesting that she file default judgments against the county commissioners. The letters were accompanied by several documents entitled "Entry of Default Judgment" which carried the purported signatures of all three defendants. The letters were addressed "Dear Lillie," and stated in part that "I suggest that you file [the default judgments] as you are suppose (sic) to. The dutys (sic) of the Clerk are to file not Judge (sic) who hears the case ... I would like to suggest so as you don't get yourself into trouble, that you file these default judgements (sic) as a clerk is suppose (sic) too (sic)."

■ Simenson's previous refusal to file the defendants' common law liens coupled with the letters' implicit recognition that Simenson might once again refuse to file the defendants' "legal" documents constituted sufficient circumstantial evidence to authenticate the Simenson letters and their accompanying default judgment documents, which contained the signatures of all three defendants. Thus, under Rule 901(b)(3), N.D.R.Ev., the signatures on the Simenson letters and the default judgment documents could be compared by the jury with the signatures on the alleged threatening letters to establish the latter's authenticity. *See* 5 Weinstein's Evidence, *supra*. Consequently, we conclude that the trial court did not abuse its discretion in refusing to exclude from the evidence the alleged threatening letters for lack of authentication.

The defendants assert that, given the nature of the "Constructive Notice and Demand" letters, they cannot be interpreted as being in violation of § 12.1–12–06(2)(b),

N.D.C.C., which provides that "[a] person is guilty of a class C felony if, with intent to influence another's official action as a public servant, he threatens: ... [t]o accuse anyone of a crime; ..."[2] We agree.

The First Amendment forbids the enactment of laws "abridging the freedom of speech ... or the right of the people peaceably to assemble and to petition the government for a redress of grievances." Article I, Section 5 of the North Dakota Constitution further provides that "[t]he citizens have a right, in a peaceable manner, to assemble together for the common good, and to apply to those invested with the powers of government for the redress of grievances, or for other proper purposes, by petition, address or remonstrance." "Remonstrance" has been defined as "a petition to a court or deliberative body in which those who have signed it request that something which is in contemplation to perform shall not be done; a representation made to a court or legislative body wherein certain persons unite in urging that a contemplated measure be not adopted or passed." 76 C.J.S. *Remonstrance*, at p. 906 (1952) (Footnotes omitted). *See also* Black's Law Dictionary 1164 (5th ed. 1979).

A statute which makes criminal a form of pure speech "must be interpreted with the commands of the First Amendment clearly in mind." *Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 644 (1969) (per curiam). The statute must be construed " 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' " *Watts, supra*, 394 U.S. at 708,

89 S.Ct. at 1401 [quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964) ].

■ Speech does not lose its protected character simply because it may embarrass others or coerce them into action. *N.A.A. C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 102 S.Ct. 3409, 3424, 73 L.Ed.2d 1215 (1982). By the same token, threats are not constitutionally protected expression if the character, intent, and circumstances of the threat are narrowly circumscribed. *See Wurtz v. Risley*, 719 F.2d 1438, 1441 (9th Cir.1983); *Landry v. Daley*, 280 F.Supp. 938, 961 (N.D.Ill.1968), *reversed on other grounds sub nom. Boyle v. Landry*, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); *People v. Superior Ct. of San Francisco*, 151 Cal.App.3d 893, 895, 199 Cal.Rptr. 150, 151 (1984); *State v. Robertson*, 293 Or. 402, 432, 649 P.2d 569, 588 (1982). Courts must be careful to distinguish what is a threat from what is constitutionally protected speech when the alleged "threat" is made in the midst of what may be other protected political expression. *See Watts, supra; Martin v. United States*, 691 F.2d 1235, 1239 (8th Cir.1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983); *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976); *United States v. Barcley*, 452 F.2d 930, 933 (8th Cir.1971).

It is with these principles in mind that we proceed to interpret the statute under which the defendants were charged and the nature of the allegedly threatening letters.

Section 12.1–12–06(2)(b), N.D.C.C., was adopted by the Legislature from, and is identical to, the proposed Federal Criminal Code's provision on threatening public servants.[3] *See* Final Report of the National

---

**2.** The defendants have not attacked the constitutionality of § 12.1–12–06, N.D.C.C. Although they assert in their brief that the statute is "over-broad and unconstitutional," this contention, without more, is insufficient to raise the constitutional issue for our consideration. *E.g., Jones v. North Dakota Workmen's Comp. Bureau*, 334 N.W.2d 188, 192 (N.D.1983).

**3.** Section 1366 of the proposed Federal Criminal Code provides in pertinent part:
"§ 1366. Threatening Public Servants.
"(1) Threats Relating to Official Proceedings or to Secure Breach of Duty. A person is guilty of a Class C felony if he threatens harm to another with intent to influence his official action as a public servant in a pending or

Commission on Reform of Federal Criminal Laws § 1366, at p. 138 (1971) [Final Report]. The commentary to the proposed Federal Criminal Code is helpful as an aid in interpreting the intent of our criminal code when the North Dakota statute does not vary in substance from its proposed federal counterpart. *E.g., State v. Pfister,* 264 N.W.2d 694, 697 (N.D.1978); *State v. Bourbeau,* 250 N.W.2d 259, 264 (N.D.1977).

The drafters' comments indicate that not all threats to accuse a public official of a crime were intended to be proscribed by the statute. In analogizing the offense of threatening public servants to the offense of bribery, the drafters stated: "If a person knows that a judge is taking a bribe, he may threaten to accuse him of the offense to stop him from doing so; but he may not use such threat to have the judge decide the case in his favor." National Commission on Reform of Federal Criminal Laws, I Working Papers 592 (1970) [Working Papers]. This distinction is further explained by the drafters of the Model Penal Code, who chose not to include a threat to accuse one of a crime within the proscriptions of its provision on threatening public servants:

"The chief difficulty in drafting a statute of this sort lies in drawing the line between permissible and impermissible threats. Many kinds of harm may be threatened or inflicted without contravening accepted standards of behavior and without impairing the integrity of government.... [U]se of threat may be either appropriate or blameworthy depending on the motives of the actor and the sympathies of the observer. Thus, for example, ... a threat to arrest or prosecute may be a proper means to induce another to abide by the law or a method of improper intimidation. These distinctions are too subtle for resolution

prospective judicial or administrative proceeding held before him, or with intent to influence him to violate his duty as a public servant.

"(2) Other Threats. A person is guilty of a Class C felony if, with intent to influence another's official action as a public servant, he threatens:

by the blunt instrument of criminal prosecution. However one may characterize the facts of a particular case, it would be intolerable to subject all such decisions to review under the penal law.

"One approach to this problem would be to restrict the prohibited threats to those made with a 'corrupt' intent. This formulation would pass the issue to the courts without definitive legislative guidance...." Comment to Model Penal Code § 240.2, American Law Institute, Model Penal Code and Commentaries, pp. 50–51 (Revised Commentaries, 1980).

It appears that the drafters of the proposed Federal Criminal Code intended to restrict prohibited threats, at least insofar as they relate to accusation of crime, to those made with an element of "corrupt" intent. *See Working Papers, supra,* at p. 591 (referring to threats to accuse one of a crime as "blackmail-type threats"); *Final Report, supra,* at p. 139 ("Where the object of the intimidator is not so clearly noxious, as under subsection (2), the means of intimidation should in themselves be reprehensible in order to render the transaction criminal.") A central characteristic of crimes such as blackmail or extortion is that the threat is used as a means to obtain money or other things of value from the victim for the purpose of gain to the one making the threat. *See State v. Jacobs,* 119 Ariz. 30, 579 P.2d 68, 71 (Ct.App.1978); *People v. Hubble,* 81 Ill.App.3d 560, 37 Ill.Dec. 189, 192, 401 N.E.2d 1282, 1285 (1980); *Robertson, supra,* 649 P.2d at 581; *cf. Landry, supra,* 280 F.Supp. at 965.

■ Construing § 12.1–12–06(2)(b), N.D. C.C., in accordance with its legislative history, the First Amendment, and our state constitutional provision guaranteeing the right of the people to apply to public offi-

"(a) to commit any crime or to do anything unlawful;

"(b) to accuse anyone of a crime; or

"(c) to expose a secret or publicize an asserted fact, whether true or false, tending to subject any person, living or deceased, to hatred, contempt or ridicule, or to impair another's credit or business repute."

cials for redress of grievances by remonstrance, we conclude that the defendants' "Constructive Notice and Demand" letters do not fall within the proscription of the statute.

Generally, whether the words used in the communication constitute a true threat is a question for the jury. *E.g., Martin, supra,* 691 F.2d at 1240; *United States v. Carrier,* 672 F.2d 300, 306 (2d Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). Nevertheless, some cases exist when a court should determine as a matter of law that a particular threat does not constitute a "true threat." In *Watts, supra,* 394 U.S. at 706, 89 S.Ct. at 1401, the defendant was a speaker at an anti-war demonstration who said " '[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.' " The jury convicted the defendant of knowingly and willfully making a threat to inflict bodily harm upon the President. The Supreme Court reversed, holding that the trial court erred in denying defense counsel's motion for judgment of acquittal. The Court characterized the defendant's statement as crude "political hyperbole" and not a threat within the meaning of the statute. *Watts, supra,* 394 U.S. at 706, 89 S.Ct. at 1401. Likewise, in *Barcley, supra,* 452 F.2d at 932, the defendant mailed a letter to his court-appointed attorney, in which, after profanely criticizing the attorney for the handling of his criminal appeal, he said, " 'as soon as I can get this case situated around in the position I want you are the first S.O.B. that will go, [the prosecutor]

will next.' " The defendant was convicted by a jury of communicating by mail threats of personal injury. The Eighth Circuit Court of Appeals reversed, holding that the evidence was insufficient to sustain the verdict. The court concluded that the defendant's letter "is worded in the rowdy-dowdy argot of the streets, but it does not clearly convey a threat of injury ... [T]he government must offer something more than the equivocal language present here to establish the communication of a threat." *Barcley, supra,* 452 F.2d at 934.

Whatever questions *Watts* and *Barcley* may raise with regard to the proper role of the court and jury in determining whether certain language used in the midst of other protected expression constitutes a threat, they do stand for the principle that there is a point beyond which an appellate court may not simply defer to the jury's determination on the matter. This is such a case.

As a matter of law, the defendants' "Constructive Notice and Demand" letters cannot seriously be construed as constituting a threat to accuse the commissioners of a crime. A threat to bring a civil action against a public official is not proscribed by the statute.[4] The statement that "If you fail to implement good faith restitution within ten (10) days from this Notice it will result in Civil and Criminal process to commence against you for DAMAGES" can only reasonably be construed as threat to commence a civil action against the commissioners. Although the letters refer to criminal process, the alleged threat is qualified by use of the term "DAMAGES,"

---

**4.** It is also not a crime to bring a frivolous lawsuit against a public official. Rather, the "punishment" for such abuses of process is the imposition of appropriate monetary sanctions against the party bringing the frivolous action. *See* Sections 28–26–01(2) and 28–26–31, N.D. C.C.; Rule 11, N.D.R.Civ.P; and Rule 38, N.D.R. App.P.

We make this observation with the following caveat:

"Freedom of access to the courts is a cherished value in our democratic society. Incremental changes in settled rules of law often result from litigation. The courts provide the mechanism for the peaceful resolution of disputes that might otherwise give rise to at-

tempts at self-help. There is, and should be, the strongest presumption of open access to all levels of the judicial system. Creating a risk that the invocation of the judicial process may give rise to punitive sanctions simply because the litigant's claim is unmeritorious could only deter the legitimate exercise of the right to seek a peaceful redress of grievances through judicial means. This Court, above all, should uphold the principle of open access." *Talamini v. Allstate Insurance Company,* 470 U.S. ——, ——, 105 S.Ct. 1824, 1827–1828, 85 L.Ed.2d 125 (1985) (Stevens, J., concurring in dismissal of appeal for want of jurisdiction) (footnotes omitted).

which are only recoverable in a civil action. Under the circumstances, the reference to criminal process and federal criminal statutes is nothing more than the "kind of political hyperbole" [*Watts, supra*], and "rowdydowdy argot" [*Barcley, supra*], of a particular species of misinformed, misled, and misguided pro se litigant. "Taken in context, ... we do not see how it could be interpreted otherwise." *Watts, supra.*

Moreover, even if we assume that the letters' final paragraph constituted a sufficient threat to accuse the commissioners of a crime, it nevertheless is not the type of threat that was intended to be proscribed by the statute. The letters state in part that "[t]his is an out and out effert (sic) to try to get rid of an honest Sheriff who is trying to follow the Laws of our country ... This notice is to let you know that you have ten (10) days from this Notice to let us know that you will not or are not in anyway (sic) going to stand back and help James Wold commit this crime against our Sheriff ... The Sheriff has done ... his duty. Now you do yours." It is evident that the only purpose of the alleged threat was to induce the commissioners to conform their conduct to the law as the defendants perceived the law to be and not to blackmail or extort for monetary gain or other advantage. While the defendants may have an unconventional and ill-conceived notion of the law, that does not render their actions unlawful under the statute. *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 271, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) ["[C]onstitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are offered.'" (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963))]. The defendants' "Constructive Notice and Demand" letters simply do not constitute the "reprehensible" or "blackmail-type" threats required to establish a violation of the statute.

Accordingly, the judgments of conviction are reversed.

MESCHKE and GIERKE, JJ., concur.

VANDE WALLE, Justice, concurring in the result.

With some trepidation I concur in the result reached by Justice Levine for the majority. The cases relied upon in the majority opinion for the conclusion that the letters at issue were not threats but, rather, "constitutionally protected speech" made "in the midst of what may be other protected political expression," involve factual situations far different from that involved in this case. As an example, in *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the statement alleged to constitute a threat, against the President of the United States, in violation of 18 U.S.C. Sec. 871(a), was made during a public rally on the Washington Monument grounds. The statute made it a violation to knowingly or willfully deposit "for conveyance in the mail or for a delivery from a post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States" or to "knowingly and willfully otherwise" make any such threat against the President. It is difficult for me to compare that situation—in which the President of the United States, who undoubtedly receives literally hundreds if not thousands of unfavorable comments each year, who most probably was unaware that this particular comment was made, and who is protected by trained security people—with an unsophisticated part-time county official to whom the law provides no particular security protection. Nor, for that matter, does the record in *Watts* reflect that the President testified that he was threatened by the remark, whereas in this instance there is testimony that at least some of the county commissioners did feel threatened by the letters. Had the facts in *Watts* been that a letter was directed to the President indicating that the defendant wanted "to get in my sights ... L.B.J." the outcome of that case might have been entirely different, because it was a statement made directly

to the President and not in the context of a political demonstration. Here, the letters were mailed directly to the county commissioners and were not a part of a political demonstration.

In *United States v. Barcley*, 452 F.2d 930, 933–934 (8th Cir.1971), the letter containing the alleged threat was characterized by the Court as "the kind of letter a court appointed attorney might expect to receive from a dissatisfied client writing from within prison walls." And, as the Court noted, "neither Barcley's attorney nor Sam Sechser testified that he experienced fear upon reading the letter."

Elected full-time public officials may well be "fair game" for derogatory comments which may or may not contain express or implied threats under the theory advanced by the majority opinion. But I am not so convinced that the same rationale necessarily applies with the same force to part-time elected officials whose position is more one of donation than it is one of remuneration. With the increasing numbers of legal actions against such officials and the advent of personal liability and increasing costs of liability insurance, we may well find ourselves with few qualified people willing to assume such positions if we permit them to be threatened with impunity under the guise of "political debate" and protection of the First Amendment. Although I agree that Section 12.1–12–06(2)(b), N.D. C.C., should be construed to permit "political debate" with all of the innuendos that term now seems to encompass, I am nevertheless uncomfortable applying the decisions relied upon in the majority opinion to the facts of this case. The principles announced by those decisions were fashioned for the facts of those cases and the facts before us are substantially different.

In the instant case, however, I agree that the "Constructive Notice and Demand" is simply gibberish which carried no threat of a crime. Whether the recipients of the letters so construed the language may be open to question. Against the background of the events occurring in our midst only a few years ago at Medina and the publicity given groups such as the Posse Comitatus which employ similar rhetoric, it is not surprising the recipients of the letters testified they felt threatened. There can be little doubt that the defendants intended to influence the actions of the county commissioners. However, the defendants were charged with violating subsection 2 of Section 12.1–12–06, N.D.C.C., which makes it a crime to influence another's official action as a public servant by threatening to commit a crime or to do anything unlawful; by accusing anyone of a crime; or by exposing a secret or publicizing an asserted fact, whether true or false, tending to subject any person, living or deceased, to hatred, contempt, or ridicule, or to impair another's credit or business repute. Subsection 1 of Section 12.1–12–06, N.D.C.C., makes it a crime to threaten harm to another with intent to influence his official action as a public servant in a pending or prospective judicial or administrative proceeding held before him, or with intent to influence him to violate his duty as a public servant. Had the defendants been charged with a violation of subsection 1, the fact that they felt threatened by the letters might be more significant.[1]

If the charge in this case were under subsection 1 of Section 12.1–12–06 rather than under subsection 2, I might not agree that the question of a threat should be taken from the jury as a matter of law. Therefore, although I concur in the result in this instance, I do not agree with all of the highly technical distinctions the majority opinion attempts to draw. I disavow the majority opinion insofar as it might appear to establish a precedent that issues involv-

---

1. But in *United States v. Barcley*, 452 F.2d 930, 34 (8th Cir.1971), one of the judges dissented from the holding that the issue of whether or not the letter constituted a threat should be taken from the jury. However, in so doing he noted that it "would seem of marginal significance whether the addressee and the prosecut-ing attorney were or were not in fact put in fear." Rather, the judge believed "[t]he question should be its effect upon an ordinary reasonable man in the position of the recipient, not whether he in fact happens to be chicken- or lion-hearted."

ing whether or not certain statements constitute threats will ordinarily be taken from the jury to be decided by the courts and insofar as it might be construed to permit persons to threaten public officials with impunity in the name of "political debate" and the First Amendment.

ERICKSTAD, C.J., concurs.