Christian SVEDBERG, (Arlo and Darlene Svedberg), Petitioner and Appellee,

v.

Anthony STAMNESS, (Andrew and Charlene Stamness), Respondent and Appellant.

Civ. No. 940192.

Supreme Court of North Dakota.

Dec. 20, 1994.

Michael E. Keller (argued), The Bergquist Law Firm, Larimore, for respondent and appellant.

Lyle H. Moe, Grand Forks, for petitioner and appellee; submitted on brief.

NEUMANN, Justice.

Anthony Stamness appeals from a two-year disorderly conduct restraining order, issued under NDCC section 12.1–31.2–01 (Supp.1993), which enjoins specific threatening, abusive, and assaultive behaviors directed at Christian Svedberg. We affirm the district court's order.

This case arises from what is apparently a long-running feud between Anthony Stamness and Christian Svedberg, both minors. The district court heard evidence and concluded that Stamness had made threats against Svedberg's physical safety including a direct threat against his life, as well as pursuing a course of action including "incessant teasing" and "harassment," all of which left Svedberg afraid to attend school. Testimony indicated that Stamness and others

referred to Svedberg as "Dumbo," a cartoon elephant with unusually large ears, and Stamness had, on one occasion, stated, "You had better watch it Dumbo or I will kill you." In addition Stamness, along with others, constructed three large snow figures that were prominently displayed throughout the community of Northwood. All of the snow figures were constructed with very large ears. After hearing the evidence the court concluded that these threats and taunts, harassment, and construction of snow figures were intended to adversely affect the safety, security, and privacy of Svedberg. As a result the court ordered that "Anthony Stamness shall have no contact with Christian Svedberg and shall cease or avoid the following specific conduct: Uninvited visits to the Petitioner, harassing phone calls to the Petitioner, calling the Petitioner abusive names (including "Dumbo"), or any other conduct which injures the Petitioner, either physically or emotionally, including the construction and public display of any effigy of Christian Svedberg."

Stamness' appeal is based on two different issues. Stamness first asserts that the district court committed error when it found that "reasonable grounds" existed to support the issuance of a disorderly conduct restraining order. Stamness also argues that the restraining order improperly restrains his First Amendment right to exercise free speech as protected by the United States Constitution.

### I. North Dakota's Disorderly Conduct Restraining Statute

The statute used to issue the disorderly conduct restraining order in this action is NDCC section 12.1–31.2–01.[1] This statute

---

1. *12.1–31.2–01. Disorderly conduct restraining order—Penalty.*

1. "Disorderly conduct" means intrusive or unwanted acts, words, or gestures that are intended to adversely affect the safety, security, or privacy of another person. Disorderly conduct does not include constitutionally protected activity.
2. A person who is a victim of disorderly conduct or the parent or guardian of a minor who is a victim of disorderly conduct may seek a disorderly conduct restraining order from any court of competent jurisdiction in the manner provided in this section.
3. A petition for relief must allege facts sufficient to show the name of the alleged victim, the name of the individual engaging in the disorderly conduct, and that the individual engaged in disorderly conduct. An affidavit made under oath stating the specific facts and circumstances supporting the relief sought must accompany the petition.
4. If the petition for relief alleges reasonable grounds to believe that an individual has engaged in disorderly conduct, the court, pending a full hearing, may grant a temporary disorderly conduct restraining order ordering the individual to cease or avoid the disorderly conduct or to have no contact with the person requesting the order. A temporary restraining order may be entered only against the individual named in the petition. The court may issue the temporary restraining order without giving notice to the respondent. The temporary restraining order is in effect until a hearing is held on the issuance of a restraining order under subsection 5.
5. The court may grant a disorderly conduct restraining order ordering the respondent to cease or avoid the disorderly conduct or to have no contact with the applicant if:
 a. A person files a petition under subsection 3;
 b. The sheriff serves the respondent with a copy of the temporary restraining order issued under subsection 4 and with notice of the time and place of the hearing;
 c. The court sets a hearing for not later than fourteen days after issuance of the temporary restraining order unless the time period is extended upon written consent of the parties, or upon a showing that the respondent has not been served with a copy of the temporary restraining order despite the exercise of due diligence; and
 d. The court finds after the hearing that there are reasonable grounds to believe that the respondent has engaged in disorderly conduct. If a person claims to have been engaged in a constitutionally protected activity, the court shall determine the validity of the claim as a matter of law and, if found valid, shall exclude evidence of the activity.
6. A restraining order may be issued only against the individual named in the petition. Relief granted by the restraining order may not exceed a period of two years. The restraining order may be served on the respondent by publication pursuant to rule 4 of the North Dakota Rules of Civil Procedure.
7. A disorderly conduct restraining order must contain a conspicuous notice to the respondent providing:
 a. The specific conduct that constitutes a violation of the order;
 b. Notice that violation of the restraining order is punishable by imprisonment of up to one year or a fine of up to one thousand dollars or both; and
 c. Notice that a peace officer may arrest the respondent without a warrant and take

allows a court to restrain conduct when it finds "that there are reasonable grounds to believe that the respondent has engaged in disorderly conduct." NDCC § 12.1–31.2–01(5)(d). This statute was enacted as part of the same bill that amended North Dakota's disorderly conduct statute, codified at NDCC section 12.1–31–01 (Supp.1993). 1993 N.D.Laws 125. Should a court find "reasonable grounds" to believe the respondent has engaged in disorderly conduct, the court is granted the power to restrain any further acts, which essentially would be criminal actions. *See* NDCC § 12.1–31–01 (providing both a definition and a penalty for disorderly conduct).

A restraining order in North Dakota is a judicial remedy that is classified under NDCC chapter 32–06, entitled Injunctions. NDCC § 32–06–07 (1976). We have previously found that restraining orders are a species of injunction, distinguished basically by their temporary nature. *Gunsch v. Gunsch*, 69 N.W.2d 739, 749 (N.D.1954). Generally injunctions have "no criminal jurisdiction, and acts or omissions will not be enjoined merely on the ground that they constitute a violation of law and are punishable as crimes." 43A C.J.S. *Injunctions* § 158. This is because, ordinarily, criminal sanctions provide the remedy for such violations. In this situation, however, the legislature has empowered the court to restrain criminal conduct upon a showing that reasonable grounds exist that tend to show disorderly conduct was committed. NDCC § 12.1–31.2–01.

■ An "injunction against acts in violation of law is proper where there is express statutory authority therefor." 43A C.J.S. *Injunctions* § 158. When such authority exists, "[i]njunctive relief under such statutes is not conditioned upon common law requirements but solely upon the terms of the statute." *Id.* The statutory authority to enjoin these criminal acts provides the sole basis for the trial court's actions in this case.

■ To issue a disorderly conduct restraining order, the trial court must find "reasonable grounds to believe that … disorderly conduct" has been committed.[2] NDCC § 12.1–31.2–01(4) (providing guidelines for the granting of a "temporary disorderly conduct restraining order"); § 12.1–31.2–01(5)(d) (providing that subsequent to a hearing a disorderly conduct restraining order may be issued). Nowhere does the statute define what is meant by the phrase, "reasonable grounds." North Dakota does, however, have a long line of cases which have construed the phrase "reasonable grounds" as it has been used in other contexts. *See, e.g., State v. Beaton,* 516 N.W.2d 645, 647 (N.D.1994); *Salvaggio v. North Dakota Dept. of Transp.,* 477 N.W.2d 195, 197 (N.D.1991); *Wolf v. ND Highway Comm'r,* 458 N.W.2d 327, 329 (N.D.1990); *Zietz v. Hjelle,* 395 N.W.2d 572, 574 (N.D.1986); *Moser v. North Dakota State Highway Comm'r,* 369 N.W.2d 650, 652 (N.D.1985) (all discussing the meaning of the term "reasonable grounds" in relation to DUI arrests under NDCC § 39–08–01). In those decisions we have consistently

the respondent into custody if the peace officer has probable cause to believe the respondent has violated an order issued under this section.

8. If the respondent knows of an order issued under subsection 4 or 5, violation of the order is a class A misdemeanor. If the existence of an order issued under subsection 3 or 4 can be verified by a peace officer, the officer, without a warrant, may arrest and take into custody an individual whom the peace officer has probable cause to believe has violated the order.

9. The clerk of court shall transmit a copy of a restraining order by the close of the business day on which the order was granted to the local law enforcement agency with jurisdiction over the residence of the alleged victim of disorderly conduct. Each appropriate

law enforcement agency may make available to its officers current information as to the existence and status of any restraining order involving disorderly conduct.

10. Notwithstanding subsection 5 of section 11–16–05, a state's attorney may advise and assist any person in the preparation of documents necessary to secure a restraining order under this section.

NDCC, § 12.1–31.2–01 (Supp.1993).

2. Even though the statute only requires that "reasonable grounds" be shown to support the issuance of a restraining order, the trial court in the instant case required petitioner to show by a preponderance of the evidence that the order should be issued. This is a more stringent standard than contemplated by the statute.

held that " 'reasonable grounds' is synonymous with the term 'probable cause.' " *Moser*, 369 N.W.2d at 652.

Probable cause exists when the "facts and circumstances within the officer's knowledge ' "are sufficient to warrant a [person] of reasonable caution in believing that an offense has been or is being committed." ' " *Beaton*, 516 N.W.2d at 647 (quoting *Moser*, 369 N.W.2d at 652–53 (quoting *Witte v. Hjelle*, 234 N.W.2d 16, 18 Syllabus ¶ 3 (N.D.1975))). In light of this long-standing line of cases we will construe "reasonable grounds" as used in NDCC section 12.1–31.2–01 with an eye to our precedent.

■ Reasonable grounds exist for purposes of this section when facts and circumstances presented to the judge are sufficient to warrant a person of reasonable caution to believe that acts constituting the offense of disorderly conduct have been committed. Stamness, in the instant case, complains that the facts and circumstances presented to the judge did not create "reasonable grounds" and, therefore, the restraining order was erroneously issued. We have reviewed the transcript and the affidavits submitted in the instant case and are convinced that reasonable grounds exist to support the issuance of the order.

■ Our review of the transcript reveals that there was conflicting testimony presented both orally and by affidavits as to the types and the significance of threats that were issued by Stamness. In the instant case it appears the judge believed Svedberg and his witnesses. "[T]he trial court is in a better position to judge the demeanor and credibility of witnesses and weigh the evidence than we who have only the cold record to review." *Ludwig v. Burchill*, 481 N.W.2d 464, 469 (N.D.1992). This is a province firmly entrusted to the trial court, and we will generally defer to its expertise. Stamness has failed to show us how or where the trial court breached its duty in the instant case. Therefore, his argument that reasonable grounds did not exist to support the issuance of the restraining order must fail.

## II. Was Stamness' Conduct Constitutionally Protected Speech?

Stamness argues that the trial court improperly ruled that his actions did not constitute an exercise of First Amendment free speech.[3] He argues that his actions were constitutionally protected, and that the trial court therefore was required to "exclude evidence of the activity." NDCC § 12.1–31.2–01(5)(d). If evidence of this protected activity were excluded, Stamness argues, there would not be enough evidence to support the "reasonable grounds" necessary to issue the restraining order. *Id.* We are unconvinced, however, that Stamness was engaged in constitutionally protected activity.

■ Freedom of speech and freedom of the press are protected by the First Amendment from infringement by Congress. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 570, 62 S.Ct. 766, 768, 86 L.Ed. 1031, 1034 (1942). They likewise are afforded protection from invasion by state action through the Fourteenth Amendment because they are "fundamental personal rights and liberties." *Id.* at 570–71, 62 S.Ct. at 768, 86 L.Ed. at 1034. The First Amendment generally prohibits the government from proscribing speech based on disapproval of its content. *R.A.V. v. City of St. Paul, Minn.*, —— U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305, 317 (1992); *Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284, 294 (1971). However, not all speech is constitutionally protected speech. *See R.A.V.* —— U.S. at ——, 112 S.Ct. at 2543, 120 L.Ed.2d at 317 (recognizing the United States Supreme Court's approach to categories of speech which are not imbued with constitutional protection). We have always "permitted restrictions upon the content of speech" within certain limited parameters because certain areas of speech are " 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *Id.* at ——, 112 S.Ct. at 2543, 120 L.Ed.2d at 317 (quoting *Chaplin-*

---

**3.** Stamness neither argues nor do we consider the constitutionality of the statute itself. Rather, his constitutional challenge runs along evidentiary lines and is based *on* the statute.

*sky,* 315 U.S. at 572, 62 S.Ct. at 769, 86 L.Ed. at 1035). These categories of expression are said "not [to be] within the area of constitutionally protected speech," *Roth v. United States,* 354 U.S. 476, 483, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, 1506 (1957); *see also Chaplinsky,* 315 U.S. at 571–72, 62 S.Ct. at 769, 86 L.Ed. at 1035; or that the "protection of the First Amendment does not extend" to these categories of speech. *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2543, 120 L.Ed.2d at 317 (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 504, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502, 519 (1984)).

■ Before analyzing whether the state has impermissibly encroached upon a person's fundamental right of free speech it must be determined whether that expression is the type to which the First Amendment extends protection. In the context of the instant case the question is more appropriately whether Stamness' expression may be classified as "fighting words." The United States Supreme Court has held that fighting words do not constitute an "essential part of any exposition of ideas." *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769, 86 L.Ed. at 1035. Therefore, despite their verbal character, fighting words constitute a " 'non-speech' element of communication," and for First Amendment purposes are basically unprotected. *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2545, 120 L.Ed.2d at 319.

Determining that fighting words are an unprotected form of communication is relatively effortless; however, determining what constitutes fighting words is infinitely more difficult. The basic test for what constitutes fighting words is enunciated in *Chaplinsky:*

> The test is what [a person] of common intelligence would understand would be words likely to cause an average addressee to fight.... The English language has a number of words and expressions which by general consent are 'fighting words' when said without a disarming smile.... Derisive and annoying words can be taken as coming within the purview of the statute as heretofore interpreted only when they have this characteristic of plainly tending to excite the addressee to a breach of the peace....

*Chaplinsky,* 315 U.S. at 573, 62 S.Ct. at 770, 86 L.Ed. at 1036 (citing *State v. Brown,* 68 N.H. 200, 38 A. 731 (1895); quoting *State v. McConnell,* 70 N.H. 294, 47 A. 267, 267 (1900)). It is not sufficient, however, if words merely offend, cause one to be indignant, or rouse anger in the person hearing the words; they must incite an addressee to breach the peace immediately. *Lewis v. City of New Orleans,* 415 U.S. 130, 133, 94 S.Ct. 970, 972, 39 L.Ed.2d 214, 219 (1974). This definition recognizes that to determine whether a particular expression constitutes fighting words is dependent upon the context in which it was used. *See Chaplinsky,* 315 U.S. at 573, 62 S.Ct. at 770, 86 L.Ed. at 1036 (recognizing that an expression delivered with a "disarming smile" may not comprise fighting words while the same expression delivered in another context may). Likewise, what may have constituted "classical fighting words" in 1942 might comprise nothing more than an innocuous expression in 2010. Because of the elusive nature of fighting words, and because the meaning and usage of words is continually evolving, the only workable definition must necessarily be contextual. As Justice Holmes wrote, "[a] word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372, 376 (1918). "[W]hether a specific act of communication is protected by the First Amendment always requires some consideration of both its content and its context." *New York v. Ferber,* 458 U.S. 747, 778, 102 S.Ct. 3348, 3366, 73 L.Ed.2d 1113, 1137 (1982) (Stevens, J., concurring in judgment). While Justice Stevens' statement was meant as a criticism of the "categorical approach" to the First Amendment, it completely captures the essence of what a court must address in order to determine whether an expression constitutes fighting words.

■ To determine if an expression constitutes fighting words, we must ask whether the expression, if delivered to a reasonable and prudent person of common intelligence, would cause the addressee immediately to breach the peace. *Cf. Chaplinsky,* 315 U.S.

at 573, 62 S.Ct. at 770, 86 L.Ed. at 1036 (restating the essence of the fighting words test). This test is applied to identify fighting words when they are delivered in a "face-to-face" confrontation, and are directed at an individual addressee.[4] *Chaplinsky,* 315 U.S. at 573, 62 S.Ct. at 770, 86 L.Ed. at 1036. Additionally, this is an objective test. *See id.* (the test is not to be "defined in terms of what a particular addressee thinks," but rather by what an objective addressee would think).

 This test, in essence, requires one to look at the context in which an expression was made. We hold that it is proper to consider the age of the addressee when determining the contextual setting. North Dakota courts have long recognized that actions and reactions of individuals differ according to age. *See, e.g., Besette v. Enderlin Sch. Dist. No. 22,* 310 N.W.2d 759, 763 (N.D.1981) (recognizing that the standard of care owed a child is greater than that owed an adult and increases with the immaturity of the child); *Moe v. Kettwig,* 68 N.W.2d 853, 860 (N.D. 1955) (recognizing that the standard of care imposed on a minor must be measured with regard to his age, capacity, intelligence, and experience). Logic demands that when determining whether an expression constitutes fighting words, the age of the addressee must be taken into account. No one would argue that a different reaction is likely if a thirteen-year-old boy and a seventy-five-year-old man are confronted with identical fighting words. Accordingly, we hold that to determine what constitutes fighting words, a court must consider both the content and the context of the expression, including the age of the participants.

 The judge in the instant case did not err when he accepted evidence regarding Stamness' taunts, threats including a threat to kill, and the public display of snow effigies which he concluded were constructed to harass Svedberg. In this context, when delivered to a fourteen-year-old, these actions when taken as a whole constitute fighting words, and are therefore unprotected by the

First Amendment. Consequently, Stamness' argument that he was engaged in protected activity fails.

Affirmed.

SANDSTROM, J., concurs.

MESCHKE, Justice, concurring.

The trial court found:

The Court is persuaded by a preponderance of the evidence that Anthony Stamness made certain threats to Christian Svedberg, including a threat to his physical safety.

. . . .

The course of conduct followed by Anthony Stamness toward Christian Svedberg can only be characterized as cruel and insensitive. However, it goes further than that since it has also resulted in threats to the physical safety of Christian and the incessant teasing and harassing conduct has left Christian afraid to go to school, a completely unacceptable situation. The testimony also indicates that Christian suffers from depression as a result and has made suicidal statements.

The Court therefore finds that the conduct of Anthony Stamness [was] intended to adversely affect the safety, security, or privacy of Christian Svedberg, and that there was no constitutionally protected activity being pursued by ... Anthony Stamness.

. . . .

The evidence indicates, and the Court accepts as true, the fact that the Respondent made a direct threat against the life of the Petitioner. This statement would certainly constitute a direct threat and could incite an immediate breach of the peace. The other derisive names used by the Respondent against the Petitioner could also constitute a breach of the peace by reason of their taunting nature and incitement to a breach of the peace. Certainly, the conduct of Anthony Stamness cannot be justi-

---

4. The question before us only requires that we define fighting words with respect to face-to-face confrontation between two individuals. We therefore need not define a test to be used when words are directed at a group.

fied under any constitutional[ ] cloak of propriety.

Whether particular words constitute a serious threat is a question of fact. *See State v. Zeno,* 490 N.W.2d 707, 710 (N.D.1992):

> In *State v. Hass,* 268 N.W.2d 456, 463 (N.D.1978), involving a similar factual situation, we indicated that the determination whether particular words constitute a threat is a question of fact:
>
> . . . .
>
> "As we said in *State v. Howe,* 247 N.W.2d 647, 654 (N.D.1976),
>
> " 'No precise words are necessary to convey a threat. It may be bluntly spoken, or done by innuendo or suggestion. . . . A threat often takes its meaning from the circumstances in which it is spoken and words that are innocuous in themselves may take on a sinister meaning in the context in which they are recited. . . . ' " [Citations omitted.]

In my opinion, under NDCC 12.1–31.2–01, the evidence amply supports the trial court's findings of fact, conclusions of law, and the protective restraining order entered.

I agree with the trial court that the entire course of conduct, including vivid threats of harm and other menacing conduct, is not constitutionally protected. "Pure speech" and expressive conduct that accompany or follow a physical threat can be, as a matter of fact, part of the threatening conduct. Therefore, I concur in affirming.

VANDE WALLE, C.J., concurs.

LEVINE, Justice, dissenting.

This case tells a sad tale of parents who failed to parent and school administrators who failed to administer. As a result, a child who should have been disciplined at home and at school, instead, was restrained by a district court from saying "Dumbo" to another child, building snowmen with big ears, and threatening and harassing the other child. He faces up to one year in prison if he violates the restraining order. NDCC § 12.1–31.2–01(7)(b).

Between August 1, 1993, the effective date of NDCC § 12.1–31.2–01, and April 13, 1994, the date of the hearing on the restraining order, Anthony Stamness, born August 27, 1977, with other children, built a series of three snowmen, each with large ears and each meant to tease and ridicule Christian Svedberg, also a minor child, and classmate of Anthony and the others. Apparently, Christian has large ears and suffered the indignity of the community nickname of "Dumbo." Christian's parents have talked to school board members about the "Dumbo"-name calling incidents at school, but to no avail. Apparently, Anthony's parents have failed to prohibit Anthony from teasing Christian and have not punished him when he did, or otherwise sought to deter him. Understandably, Christian's parents would like to stop Anthony from holding their son up to public ridicule and causing him pain and suffering.

The statute at issue here was passed in response to the growing community awareness of domestic violence and the need to control stalking. *See* S.Jud.Comm.Minutes, H.B. 1238 (March 8, 1993) [hereinafter Minutes], testimony of Ms. Bonnie Palacek and Senator Judy L. DeMers. There was a need for a statute authorizing the issuance of a civil restraining order against the frequently employed tactics of intimidation by stalking, engaged in by expartners of broken relationships, who had not perpetrated physical violence and, therefore, could not be restrained under NDCC § 14–07.1–02, because there was no imminent threat of physical harm. As Ms. Palacek explained:

> "Currently, only those with a history of physical abuse and who are in 'imminent threat of physical harm' may petition the court for a Protection Order. [NDCC § 14–07.1–02.] Although in some parts of the state this language has been stretched to cover victims who don't have such a history, in other parts of the state they have no protection at all.

> "For example, in the Fargo area, victims from Minnesota who are clients of the Rape and Abuse Crisis Center have access to such Orders, but clients who live on the North Dakota side of the river don't." Minutes, *supra.*

The hope was that the option of a civil restraining order would obviate the need for victims of stalking to rely on state's attorneys to initiate criminal prosecutions with the requirement of proof beyond a reasonable doubt. Minutes, *supra* (testimony of Bonnie Palacek and James Vukelic). A civil restraining order against stalking would be quicker, simpler, and accomplish the goal of protection from the intimidation and fear caused by the stalker. Minutes, *supra.* It is clear to me from the legislative history and the language of NDCC § 12.1–31.2–01, that the intent of the legislature was to protect the victims of stalking and intimidation from conduct by perpetrators which had put them in fear for their lives, their safety, their security.

It is not only through the statute but also through its legislative history, that the facts of this case must be filtered. The transcript reveals that a mean and insensitive teenager teased and made fun of another teenager. On one occasion, Christian says, Anthony said he would kill him. On one other occasion, Christian says, Anthony followed him in the car. Those are the facts.

In *City of Bismarck v. Schoppert,* 469 N.W.2d 808, 810–11 (N.D.1991), we traced the evolution of the fighting words doctrine from *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) [freedom of speech does not protect "insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."], through *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949) [speech that is "shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest" may not be punished], to *Gooding v. Wilson,* 405 U.S. 518, 525, 92 S.Ct. 1103, 1107, 31 L.Ed.2d 408 (1972) [words that convey disgrace or insult the listener are not fighting words because they do not "by their very utterance ... tend to incite an immediate breach of the peace."]. We concluded that fighting words are not those that simply inflict emotional

injury but must be " 'personally abusive epithets which ... as a matter of common knowledge [are] inherently likely to provoke violent reaction.' " *Id.* 469 N.W.2d at 811–12 (quoting *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)). *See also UWM Post, Inc. v. Board of Regents,* 774 F.Supp. 1163 (E.D.Wis.1991).

The point is that fighting words are to be interpreted "narrowly," *R.A.V. v. City of St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2567, 120 L.Ed.2d 305, 347 (1992), not expansively, as the majority construes them. And fighting words are to be measured by an objective standard, not by an individualized subjective one. *See Cohen, supra; see also, e.g., State v. Authelet,* 120 R.I. 42, 385 A.2d 642 (1978). So the fact that Anthony was hurt, offended and upset by being called "Dumbo," and by seeing snowmen with big ears, is not the determining, or even relevant, fact. It is how ordinary people would react. And, if the first amendment protects "virulent ethnic and religious epithets," *United States v. Eichman,* 496 U.S. 310, 318, 110 S.Ct. 2404, 2409, 110 L.Ed.2d 287 (1990), and threats to "break your damn neck ... [if you go into racist stores]", *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 902, 102 S.Ct. 3409, 3419, 73 L.Ed.2d 1215 (1982), how can it be possible that it does not protect saying "Dumbo" and making snowmen? [1]

I do not disagree that context is important in looking at whether words are fighting words and that ordinary teenage children may react differently than older, ordinary folks. But I cannot agree that given the context of this case, that erecting three snowmen with big ears and calling someone "Dumbo" can be constitutionally prohibited by a court. I am sure that the derisive name, "Dumbo," and the snowmen with big ears caused Christian to suffer humiliation and pain and embarrassment. What they did not cause and what they were not likely to cause was the risk of an immediate breach of the peace.

---

1. Because the majority's analysis makes no distinction between pure speech, *i.e.,* saying "Dumbo," and expressive conduct, *i.e.,* building a snowman with big ears, *see Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), neither does mine.

I have no difficulty at all agreeing with the proposition that a threat of violence is not protected speech. *E.g., Madsen v. Women's Health Center, Inc.,* —— U.S. ——, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). I have greater difficulty taking seriously the utterance of an insensitive, teenage clod, a type my children would have described as a "meanie," especially in the context of this case. Anthony did not engage in any pushing, shoving, hitting, punching, slapping, tripping, brandishing of arms, or any other physical bullying. With the exception of the one occasion, he did not make any verbal threats. Hyperbole and bluster do not constitute a "true" threat. *Cf. State v. Haugen,* 392 N.W.2d 799 (N.D.1986). Anthony simply did not engage in any discernible pattern of threatening behavior. Instead, he cruelly made fun of Christian by calling him "Dumbo" and by building three snowmen. Not the stuff that violence is made of. But, even so, I might not object if the restraining order only forbade threats of violence. It goes much farther than that.

Instead of proceeding with caution to narrowly construe the meaning of "disorderly conduct" in NDCC § 12.1-31.2-01, in applying the statute to these facts, the majority's treatment turns it into an overbroad, unconstitutional statute, at least, as applied. That is distressing, given the great need for the legislation and all of the cases in which it could and, I hope, will be applied constitutionally. After all, we must remember that the United States Supreme Court looks to the construction given to an allegedly overbroad state statute by the state's supreme court in determining whether the statute passes constitutional muster. *See, e.g., Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974).

This case cries for the exercise of parental responsibility and school responsibility. It goes without saying that parents and school authorities have considerable power to control children. Rather than encourage the exercise of that control, the court steps into the breach. I think that is a mistake and that "[p]arents should be discouraged from resorting to the courts to resolve ordinary problems of daily living." *Stephanie L. v.*

*Benjamin L.,* 158 Misc.2d 665, 602 N.Y.S.2d 80 (Sup.1993).

The only order that should have issued in this case, aside from dismissal, is one directed to Anthony's parents to parent Anthony and to Anthony's school principal and teachers to control Anthony.

I respectfully dissent.