2013 ND 164
**Wendy REBEL, Petitioner and Appellee**

**v.**

**Jesse REBEL, Respondent and Appellant.**

**Wendy Rebel, Petitioner and Appellee**

**v.**

**Brandi Rebel, Respondent and Appellant.**

**Nos. 20130032, 20130033.**

Supreme Court of North Dakota.

Sept. 25, 2013.

Rehearing Denied Oct. 22, 2013.

Mary E. Nordsven, Dickinson, N.D., for petitioner and appellee.

Justin D. Hager, Bismarck, N.D., for respondents and appellants.

KAPSNER, Justice.

[¶ 1] Jesse Rebel and Brandi Rebel ("Rebels") appeal from district court orders granting Wendy Rebel two-year disorderly conduct restraining orders against them. We affirm, concluding the district court did not abuse its discretion in granting the disorderly conduct restraining orders against the Rebels under N.D.C.C. § 12.1–31.2–01.

I

[¶ 2] Wendy Rebel and Jesse Rebel were divorced in 2009 and have two minor children. In 2011, Jesse Rebel married Brandi Rebel.

[¶ 3] On April 26, 2012, Wendy Rebel petitioned the district court for disorderly conduct restraining orders against Jesse Rebel and Brandi Rebel. Wendy Rebel's petitions alleged, in part, an incident occurring on April 17, 2012, after a school program, in which Brandi Rebel purportedly used vulgar and abusive language toward Wendy Rebel. Her petitions also alleged a confrontation occurring on April 25, 2012, in which the Rebels approached Wendy Rebel in her car parked in front of the school, where she was picking up her son, and began shouting at her and calling her vulgar and abusive names. Wendy Rebel asserts the Rebels confronted her over alleged DNA evidence purportedly showing Jesse Rebel was not the father of their children. Wendy Rebel's petitions asserted that at the time she was frightened and called the police.

[¶ 4] On April 27, 2012, the district court issued a temporary disorderly conduct restraining order against each of the Rebels. A judicial referee held a hearing on the petitions and subsequently issued a two-year disorderly conduct restraining order in each case in July 2012. The Rebels requested the district court to review the judicial referee's findings and orders. On December 10, 2012, the district court conducted a full evidentiary hearing on Wendy Rebel's petitions. After the hearing, the court initially entered orders in December 2012, affirming the judicial referee's disorderly conduct restraining order in each case. In doing so, the court made its own findings of fact, in addition to adopting the findings of the judicial referee. The Rebels promptly objected to the district court's orders as improper under N.D. Sup. Ct. Admin. R. 13, § 11. The district court subsequently entered orders in January 2013, rejecting the judicial referee's findings, making its own findings of fact, and granting a two-year disorderly conduct restraining order in each case.

The court did not specifically vacate its initial December 2012 orders. The Rebels appealed from the district court's December 2012 orders, affirming the judicial referee's disorderly conduct restraining orders, and from the court's January 2013 orders, granting disorderly conduct restraining orders.

[¶ 5] The district court's January 2013 orders, however, did not include the specific conditions of violations of the restraining orders. Therefore, after oral argument to this Court on June 5, 2013, we ordered the cases temporarily remanded to the district court for 14 days for the limited purposes of amending the January 2013 orders to include specific conditions of violation of the restraining orders. Because the court's amended orders entered in June 2013 on limited remand in each of the cases have designated the specific conditions of violation of the restraining orders, we turn to the merits of the appeal.

## II

[¶ 6] The Rebels argue the district court erred in affirming the judicial referee's orders and making new findings in both cases. The Rebels apparently rely on this Court's decision in *Benson v. Benson*, 495 N.W.2d 72, 77 (N.D.1993), which predates the 2004 amendments to N.D. Sup. Ct. Admin. R. 13.

[¶ 7] In *In re B.F.*, 2009 ND 53, ¶¶ 9–12, 764 N.W.2d 170, this Court discussed the evolution of the standard in North Dakota for reviewing a judicial referee's decision. Specifically, this Court noted the amendments to N.D. Sup. Ct. Admin. R. 13, § 11, that became effective on March 1, 2004. *See In re B.F.*, at ¶ 11. Rule 13, § 11, N.D. Sup. Ct. Admin. R. provides:

(a) A review of the findings and order may be ordered at any time by a district court judge and must be ordered if a party files a written request for a review within seven days after service of the notice in Section 10(b). The request for review must state the reasons for the review. A party requesting review must give notice to all other parties. A party seeking to respond to a request for review must file their response within 14 days after service of notice of the request.

(b) The review by a district court judge must be a de novo review of the record. The district court may:

(1) adopt the referee's findings;

(2) remand to the referee for additional findings; or

(3) reject the referee's findings.

(c) If the district court judge rejects the referee's findings, the court shall issue its own findings of fact, with or without a hearing.

Further, N.D. Sup. Ct. Admin. R. 13, § 10(a), states: "The findings and order of the judicial referee have the effect of the findings and order of the district court until superseded by a written order of a district court judge." Although the Rebels suggest, relying on prior law, the district court was to accept the referee's findings unless they were "clearly erroneous," we observed that under our system of review, a district court judge does not act in a "true appellate capacity" in reviewing a judicial referee's decision under the de novo standard. *See In re B.F.*, at ¶ 12.

[¶ 8] The Rebels argue that the district court did not follow the law in reviewing the judicial referee's findings. They assert there was a procedural error because the district court's initial order in each case affirmed the judicial referee's orders and "adopt[ed] the findings," and the second order in each case granted the disorderly conduct restraining order and "reject[ed] the findings" of the judicial referee. They also note the district court

failed to vacate the initial December 2012 orders before entering the January 2013 orders. The Rebels contend N.D. Sup. Ct. Admin. R. 13 was not followed in the December 2012 orders and was followed in the January 2013 orders, causing "procedural uncertainty."

[¶ 9] Nonetheless, this Court has said that "[a]n amended order may alter a previous order or it may supersede the original order." *Hughes v. Powers*, 453 N.W.2d 608, 610 (N.D.1990). In reviewing the various orders, it is clear that the district court plainly intended the January 2013 orders to supersede both the December 2012 orders and the judicial referee's original orders in each case. *See Hughes*, 453 N.W.2d at 610; N.D. Sup. Ct. Admin. R. 13, § 10(a). The court's January 2013 orders specifically rejected the judicial referee's findings and made findings which supersede the December 2012 orders. Here, the Rebels appealed from both the December 2012 orders and the January 2013 orders. Therefore, the district court's January 2013 orders, as supplemented by the June 2013 amended orders entered in each case on limited remand, will be reviewed on appeal. We conclude the Rebels' assertion of "procedural uncertainty" is without merit.

## III

[¶ 10] The Rebels argue the district court erred in granting the disorderly conduct restraining orders.

[¶ 11] "Under N.D.C.C. § 12.1–31.2–01, the district court has discretion 'to grant a disorderly conduct restraining order and to conduct a hearing on a petition for an order.'" *Hanisch v. Kroshus*, 2013 ND 37, ¶ 9, 827 N.W.2d 528 (quoting *Gonzalez v. Witzke*, 2012 ND 60, ¶ 8, 813 N.W.2d 592). "Disorderly conduct" is defined as "intrusive or unwanted acts, words, or gestures that are intended to adversely affect the safety, security, or privacy of another person," but "does not include constitutionally protected activity." N.D.C.C. § 12.1–31.2–01(1).

[¶ 12] The district court may grant a temporary disorderly conduct restraining order without notice to the respondent and pending a full hearing when a petitioner has alleged "reasonable grounds" to believe that an individual has engaged in disorderly conduct. N.D.C.C. § 12.1–31.2–01(4). If the petitioner complies with procedural requirements under N.D.C.C. § 12.1–31.2–01(5), the court may then grant a restraining order if, after a hearing, the court finds "reasonable grounds" to believe the respondent has engaged in "disorderly conduct." *See Hanisch*, 2013 ND 37, ¶ 10, 827 N.W.2d 528. "In other words, an objective, reasonable person must believe the respondent has engaged in ... [disorderly conduct]." *Wetzel v. Schlenvogt*, 2005 ND 190, ¶ 19, 705 N.W.2d 836. Showing a "pattern" is not required, and a single occurrence constituting disorderly conduct may be sufficient for the district court to grant the restraining order. *Hanisch*, at ¶ 11; *Gonzalez*, 2012 ND 60, ¶ 23, 813 N.W.2d 592.

[¶ 13] Generally, the petitioner's case must be established through testimony in a full evidentiary hearing before the district court, rather than affidavits alone, with an opportunity for cross-examination. *See Hanisch*, 2013 ND 37, ¶ 11, 827 N.W.2d 528. "It is insufficient to show the person's actions are unwanted; rather, the petitioner must show specific unwanted acts that are intended to affect the safety, security, or privacy of another person." *Cusey v. Nagel*, 2005 ND 84, ¶ 7, 695 N.W.2d 697. This Court will not reverse the district court's decision to grant a restraining order or conduct a hearing unless there is an abuse of discretion. *Hanisch*,

at ¶ 9. A court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, when it misinterprets or misapplies the law, or when its decision is not the product of a rational mental process leading to a reasoned determination. *Id.*

[¶ 14] After the December 2012 evidentiary hearing, the district court ultimately rejected the judicial referee's findings and issued its own findings of fact in the January 2013 orders entered in each case. Regarding the April 25 incident, the court made similar findings of fact in both Jesse Rebel's case and Brandi Rebel's case. The court found Jesse Rebel decided to confront Wendy Rebel regarding an alleged DNA test purportedly showing he was not the father of his two children with Wendy Rebel. The court found that Jesse Rebel invited Brandi Rebel to go with him to Wendy Rebel's car to confront her; that Brandi Rebel accompanied Jesse Rebel to the car; and that Brandi Rebel attempted to persuade Wendy Rebel to get out of the car. The court found that in doing so Brandi Rebel yelled vulgar and inappropriate language calling Wendy Rebel a "fucking liar." The court also found Brandi Rebel told Wendy Rebel that "she was not brave enough to get out of the car." The court found Jesse Rebel made no attempt to restrain or redirect his wife Brandi Rebel.

[¶ 15] The district court found that a witness, who had been parked in a vehicle behind Wendy Rebel, testified she saw Jesse Rebel and Brandi Rebel trying to "entice" Wendy Rebel out of her car. The witness testified that she heard yelling, was concerned for Wendy Rebel, and contemplated calling police. After the confrontation the witness approached Wendy Rebel's car and observed that Wendy Rebel was crying, shaking, and in the process of calling the police. The district court

also found that Jesse Rebel's testimony completely lacked credibility and that, while Jesse Rebel suggested he had DNA evidence proving he was not the father of the two children, he refused to provide a copy when subpoenaed by Wendy Rebel and also asserted he wanted to exercise his rights of visitation.

[¶ 16] In its findings of fact in Brandi Rebel's case, the district court additionally found regarding the alleged April 17 incident that a vehicle driven by Jesse Rebel had stopped on the street in front of the school and that Brandi Rebel yelled at Wendy Rebel out of the passenger window of the vehicle using vulgar and obscene language. Although Brandi Rebel denied the April 17 incident took place, the court found she told Wendy Rebel to "stop fucking lying." Other witnesses to the April 17 incident testified that Wendy Rebel was upset and crying. The district court also found that after the April 25 confrontation, Brandi Rebel posted the following "explanation" on her Facebook page:

> Omg freaking hilarious story ... so Jesse's ex is still denying the DNA results so we decided to show her what shes gonna see in court and what does she do, start freaking out, shaking so bad I thought she was having a seizure and I'm positive she pissed herself! Never saw anyone look as guilty as that!! It was very entertaining, I laughed!!

[¶ 17] On appeal, the Rebels argue the district court erred in granting the disorderly conduct restraining orders. Regarding Jesse Rebel, they argue that the court basically found him to be an accomplice to his wife's disorderly conduct and that he himself did "nothing." They contend Wendy Rebel's testimony and the other witness's testimony supports the notion that he did not specifically say anything to Wendy Rebel. They also contend the find-

ing that Jesse Rebel tried to entice Wendy Rebel out of her car is without support in the record.

[¶ 18] The district court found that Jesse Rebel decided to confront Wendy Rebel regarding the alleged DNA test and invited Brandi to go with him; that when Brandi Rebel was yelling vulgar and inappropriate language, he made no attempt to restrain or redirect his wife; that a witness saw both trying to entice Wendy to exit her car and both gesturing and pointing at a piece of paper; and that Wendy was shaking and crying after the incident. At the evidentiary hearing, the court specifically found Jesse Rebel had a role in the April 25 confrontation:

> [The witness in the vehicle behind Wendy Rebel's] said she heard Brandi yelling for Wendy to get of the car, not brave enough to get out. If that's not an invitation to a bre[a]ch of the peace and a fight I don't know what is.
>
> Jesse was standing right there. Jesse testified he told Brandi "let[']s go over there and talk to her and question about the DNA." So he knew quite well what was going to ensue. He was right in the middle of a very threatening situation.
>
> Brandi clearly said "I want Wendy out of the car" and Brandi said that Wendy's "not brave enough to get out." So at a minimum Jesse was an accomplice to the behavior and he set up the situation that he knew or had to know was going to result.

[¶ 19] Both Jesse Rebel and Brandi Rebel testified that it was Jesse Rebel's idea to approach Wendy Rebel's car in front of the school, that they approached Wendy Rebel's car together, and that they both talked to Wendy Rebel. Jesse Rebel himself testified that one purpose of the April 25 encounter was: "Just so I knew the answer. I wanted her to admit it." While there may not be specific testimony supporting the court's written finding that Jesse Rebel was also yelling and gesturing to the paper with the alleged DNA test, Jesse Rebel's role in the April 25 incident was shown to be far more than merely a bystander to Brandi Rebel's tirade. We do not hold that Jesse Rebel had an affirmative obligation to "restrain or redirect" his wife under these circumstances, but rather that the court could find reasonable grounds to believe that Jesse Rebel engaged in disorderly conduct.

[¶ 20] Regarding Brandi Rebel, the Rebels seem to argue that Wendy Rebel did not do enough to repel Brandi Rebel's confrontation; that all the incidents were "very brief in nature"; that Wendy's safety was not at issue; that Wendy's privacy was not affected; that Wendy did not tell the Rebels to leave; and that these incidents were not intended to adversely affect Wendy's safety, security, or privacy. Further, the Rebels argue the April 17 incident was disputed. However, "[a] single occurrence of disorderly conduct may be sufficient for a district court to grant a disorderly conduct restraining order." *Gonzalez*, 2012 ND 60, ¶ 23, 813 N.W.2d 592. In reviewing the record, the language and conduct during the April 25 confrontation alone was found to be threatening, as if to incite a fight, and there is clear evidence that Wendy Rebel was afraid, in that she was shaking, crying, and called the police. We also believe that the district court relied on Brandi Rebel's Facebook posting as corroboration that the Rebels had engaged in threatening actions, rather than as an independent ground for imposing the restraining orders. The court's findings on the April 17 incident provide context for the subsequent confrontation. There was also witness testimony supporting the seriousness of the April 25 confrontation.

[¶ 21]   In reaching its decision, the district court found the Rebels' words and actions during the April 25 incident, in which Jesse Rebel and Brandi Rebel confronted Wendy Rebel regarding the parentage of her children in her parked car in front of an elementary school, was intended to adversely affect Wendy Rebel's safety, security, or her privacy.   The court found the Rebels engaged in disorderly conduct through this incident.   Based on our review of the record, we conclude the district court did not act in an arbitrary, unreasonable, or unconscionable manner, did not misinterpret or misapply the law, and that the court's decision is the product of a rational mental process leading to a reasoned determination.   We conclude the court did not abuse its discretion in granting the disorderly conduct restraining orders against the Rebels.

### IV

[¶ 22]   The Rebels further argue the district court erred in failing to find that the speech involved in this matter was constitutionally protected.

[¶ 23]   "Whether an activity is constitutionally protected is a question of law, subject to full review on appeal." *Hoggarth v. Kropp*, 2010 ND 197, ¶ 11, 790 N.W.2d 22 (citing *State v. Holbach*, 2009 ND 37, ¶ 11, 763 N.W.2d 761).   "When Free Speech arguments are made, the reviewing court must independently scrutinize the record to see if the charged conduct is protected." *Hoggarth*, at ¶ 14 (quoting *City of Fargo v. Brennan*, 543 N.W.2d 240, 243 (N.D.1996)).   "[A] reviewing court has a constitutional duty to independently examine the record as a whole to assure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Hoggarth*, at ¶ 11 (quotations omitted).   We have explained, however, that the constitutional freedom of speech does not protect "fighting words":

The First Amendment to the U.S. Constitution provides: "Congress shall make no law . . . abridging the freedom of speech. . . ." The First Amendment's protection of freedom of speech applies to states through the due process clause of the Fourteenth Amendment to the U.S. Constitution. *Stromberg v. California*, 283 U.S. 359, 368 [51 S.Ct. 532, 75 L.Ed. 1117] (1931) (citing *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925)).   "The First Amendment generally prohibits the government from proscribing speech based on disapproval of its content." *Svedberg v. Stamness*, 525 N.W.2d 678, 682 (N.D. 1994).   However, the constitutional right to freedom of speech does not protect "fighting words" that "tend to incite an immediate breach of the peace." *City of Bismarck v. Schoppert*, 469 N.W.2d 808, 810 (N.D.1991) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 [62 S.Ct. 766, 86 L.Ed. 1031] (1942)).   "Fighting words" are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Schoppert*, at 811–12 (quoting *Cohen v. California*, 403 U.S. 15, 20 [91 S.Ct. 1780, 29 L.Ed.2d 284] (1971)).   "This definition recognizes that to determine whether a particular expression constitutes fighting words is dependent upon the context in which it was used." *Svedberg*, at 683 (citing *Chaplinsky*, at 573 [62 S.Ct. 766] );   *see also Schoppert*, at 812 ("[W]hether particular words are 'fighting words' depends on the circumstances of their utterance. . . .").   "Because of the elusive nature of fighting words, and because the meaning and usage of words is continually evolving, the only workable defi-

nition must necessarily be contextual." *Svedberg,* at 683.

*Interest of H.K.,* 2010 ND 27, ¶ 13, 778 N.W.2d 764.

[¶ 24] On appeal, the Rebels argue that the words used in this case were not "fighting words," were not threatening, and the phrase "stop fucking lying" should be protected free speech as it is merely "descriptive" language. The Rebels further assert that asking Wendy Rebel to get out of her car and telling her that she is not "brave enough" is not sufficient to be "fighting words." Although they appear to concede that the words may arouse anger or offend someone, the Rebels argue, standing alone, the words do not appear to lead to an "immediate" breach of the peace. The Rebels also suggest the words were not said "face-to-face," because Wendy Rebel was in her car totally protected, doors locked, windows up, with a cell phone handy, and that her personal space was not violated. The Rebels assert the district court failed to "fully analyze" the speech in this case even though they made a constitutional challenge.

[¶ 25] Here, the district court found that Wendy Rebel's safety, security, and privacy were compromised by the Rebels' threatening actions and that the language used to get her out of the vehicle constituted "fighting words" with no legitimate First Amendment purpose. We conclude the district court did not err in holding that the language used during the April 25 confrontation was not entitled to First Amendment protection as "fighting words." We conclude the district court did not err by finding the speech involved was not constitutionally protected.

[¶ 26] We therefore conclude that the district court did not abuse its discretion in granting the disorderly conduct restraining orders under N.D.C.C. § 12.1–31.2–01.

V

[¶ 27] The orders are affirmed.

[¶ 28] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, DANIEL J. CROTHERS and DALE V. SANDSTROM, JJ., concur.